## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **MARKELLA SEHER** | |
| *Plaintiff,* | |
| v. | Case No.: |
| **ASTRAZENECA PHARMACEUTICALS, LP,** | *Jury Trial Demanded* |
| *Defendant.* | |

## PLAINTIFF'S ORIGINAL COMPLAINT

This action involves claims for religious discrimination under Title VII of the Civil Rights Act of 1964 ("**Title VII**"), 42 U.S.C. 2000e-2 et seq., and the North Carolina Equal Employment Practices Act ("**NCEEPA**"), N.C. Gen. Stat. Ann. § 143-422.2.

## I.     INTRODUCTION

1.      Ms. Seher ("**Plaintiff**" or "**Ms. Seher**") started working for AstraZeneca Pharmaceuticals LP., ("**AstraZeneca**" or "**Defendant**") in 2003 as a Study Delivery Operations Specialist. She was promoted twice, eventually to Study Delivery Leader, and left the company in 2012.

2.      On March 10, 2014, Ms. Seher returned to AstraZeneca as a Local Study Team Leader. Ms. Seher worked for AstraZeneca for almost seventeen years in total. Because of her exceptional performance records, by 2019, she had been promoted to Study Start Up Associate Director, a 100% remote position.

1

3.     Prior to AstraZeneca's COVID-19 vaccination mandate (the "**Mandate**"), Ms. Seher resided in Garnet Valley, Pennsylvania and worked a hybrid schedule that only required her to report to AstraZeneca's open workspace two days per week.

4.     In or around March of 2020, AstraZeneca also transitioned almost the entirety of its workforce to virtually 100% remote work due to the threats associated with the COVID-19 pandemic. This was regardless of whether employees had executed a remote work agreement with the company.

5.     In May of 2021, AstraZeneca converted Ms. Seher to a 100% remote employee so that she could re-locate. In July of 2021, she informed her line manager that she would be moving to Hendersonville, North Carolina at the end of August of 2021.

6.     In her fully remote role, Ms. Seher was not required to travel or have any in person contact with investigators, AstraZeneca employees, or others as part of her essential job duties.

7.     On or about January 31, 2022, AstraZeneca imposed a COVID-19 vaccination mandate as a condition of continued employment.

8.     The Mandate set February 28, 2022, as the submission deadline for religious or medical exemption requests to the Mandate.

9.     Ms. Seher timely submitted her religious accommodation request to the Mandate on or around February 24, 2022.

10.     AstraZeneca denied Ms. Seher's religious accommodation request to the Mandate, claiming that she is not qualified for an accommodation and based on a purported undue hardship defense.

2

11.     AstraZeneca refused to engage Ms. Seher on a personal level to evaluate her religious conflict with the Mandate. She had no in-person communications with persons reviewing her accommodation request or an interview to discuss the sincerity or religious nature of her beliefs.

12.      On April 29, 2022 – long after it was abundantly clear in the general public and the medical community that the mandated vaccines were completely incapable of stopping or even meaningfully or significantly minimizing the risk of infection and transmission of COVID-19 – AstraZeneca terminated Ms. Seher, relying heavily on pretextual workplace safety rationales (again, Ms. Seher was a 100% remote employee), and based on a patently inauthentic undue hardship defense.

13.     Further, AstraZeneca terminated Ms. Seher, despite actual knowledge that those vaccinated for COVID-19 were contracting and spreading COVID-19 at similar or even higher rates than the unvaccinated employees, like Ms. Seher.

14.     Said differently, AstraZeneca terminated Ms. Seher with actual knowledge that her vaccination status posed no greater health or safety threat to anyone than the threat posed by a vaccinated employee (even assuming the fiction that she was *not* a 100% remote worker).

15.     Ms. Seher was a 100% remote employee and could have continued to seamlessly perform her essential job duties exceptionally well, as she had done throughout the pandemic while unvaccinated. In other words, AstraZeneca could have accommodated Ms. Seher at no cost or purported risk to its workplace through simply observing the status quo.

16.     In the event that Ms. Seher was required to travel on-site to perform her job, or was required to perform her essential duties in-person, she could have seamlessly performed her job

3

through, inter alia: (1) providing proof of a negative COVID-19 test in the unshown event that Ms. Seher would have hypothetically been required to travel onsite; (2) masking; (3) recognizing the scientific reality of natural immunity against COVID-19 as an accommodation option; (4) allowing for a vaccinated colleague to travel to a worksite in the unshown event that Ms. Seher would have hypothetically been required to travel onsite (i.e., voluntary schedule swapping); (5) observing other enhanced safety protocols where necessary (e.g., social distancing, masking, quarantining when symptomatic), or (6) any combination of the above.

17. In short, Ms. Seher could have been accommodated without any hardship whatsoever, and in a manner that would have created a *safer* workplace than requiring vaccination alone. Defendant, therefore, cannot show that it would have been a "substantial burden" or expense to have accommodated Ms. Seher's religious beliefs. *See Groff v. DeJoy*, 600 U.S. 447, 470 (2023) (holding that, under Title VII, employers must accommodate their employee's religious beliefs short of "substantial burden" or expense when viewed in light of the particular businesses' capabilities to accommodate).

18. Defendant also violated Title VII (42 U.S.C. § 2000e-2 *et. seq*) and North Carolina law by failing to engage in a good faith interactive process to determine if a reasonable accommodation existed for Ms. Seher, failing to provide any of the available low-cost and no-cost reasonable accommodations to Ms. Seher, and engaging in religious discrimination by treating similarly situated, secular employees more favorably than Ms. Seher.

19. Accordingly, Ms. Seher seeks damages, including back pay, front pay, liquidated damages, lost benefits, compensatory damages, damages for emotional distress, pain and suffering,

punitive damages, and reasonable attorneys' fees and costs, declaratory relief, injunctive relief, as well as any other relief to which he is entitled.

## II.   JURISDICTION AND VENUE

20.     This court has original jurisdiction of this civil action as one arising under the laws of the United States.  *See* 28 U.S.C. §1331.  This Court has jurisdiction over the subject matter of this civil action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, *et. seq*.

21.     Venue is proper in the Court under 42 USC § 2000e-5(f)(3) because but for Defendant's unlawful actions, Ms. Seher would have continued working in this District, and the unlawful activities alleged occurred within this District. 42 USC § 2000e-5(f)(3).

## III.   PARTIES

22.     Plaintiff Markella Seher is a resident of North Carolina, residing in Hendersonville, North Carolina.

23.     Defendant AstraZeneca Pharmaceuticals is a corporation with its principal place of business in Wilmington, Delaware. AstraZeneca conducts its' business in this District, and the discrimination alleged occurred within this District.

## IV.   FACTUAL ALLEGATIONS

*Ms. Seher's Employment with AstraZeneca*

24.     Ms. Seher worked for AstraZeneca from 2003 until 2012. She later returned in 2014 as a Local Study Team Leader. Eventually, due to her exceptional performance record, she was promoted to Study Start Up Associate Director.

25.     In her role, Ms. Seher was responsible for virtually managing the delivery of clinical studies and research, managing a team of about 15 employees.

5

26.     Because Ms. Seher's essential job duties were performed 100% remotely, Ms. Seher's role did not require in-person contact.

***AstraZeneca's COVID-19 Vaccination Mandate***

27.     Initially, AstraZeneca advised employees that it would respect their decision on whether to receive a COVID-19 vaccine.

28.     On or about January 31, 2022, AstraZeneca reversed course and imposed a COVID-19 vaccination mandate on its entire U.S. based workforce.  The Mandate set February 28, 2022, as the submission deadline for religious or medical exemption requests to the Mandate.

29.     In the January 31, 2022, announcement, AstraZeneca highlighted that 92% of its workforce was already fully or partially vaccinated against COVID-19.

30.     At this time, it was abundantly clear that the available COVID-19 vaccines were ineffective at preventing infection and transmission of COVID-19, as AstraZeneca's own internal COVID-19 tracking data will reveal.

31.     Because AstraZeneca closely tracked COVID-19 infections in its workforce, AstraZeneca had actual knowledge that vaccinated employees were still contracting and transmitting COVID-19 at similar or higher rates than unvaccinated employees.

32.     As early as August 2021, the Centers of Disease Control and Prevention ("**CDC**") recognized that the COVID-19 vaccines worked "with regard to severe illness and death…but what they c[ouldn't] do anymore is prevent transmission." Statement by Rochelle Walensky, U.S.

Centers for Disease Control, CNN Interview (Aug. 5, 2021).[1] As such, federal health authorities acknowledged prior to Ms. Seher's termination that the mandated vaccines were personal protection devices incapable of preventing infection and transmission of the virus.

33. Consistent with federal health authority pronouncements, on February 11, 2022, one of the AstraZeneca local offices posted a notice stating, "Remember – Anyone can still carry and spread COVID-19 even without symptoms, after prior infection or when fully vaccinated." This conclusively demonstrates AstraZeneca had actual knowledge that the available COVID-19 vaccines were incapable of preventing transmission and infection.

34. During this time, AstraZeneca possessed actual and/or constructive knowledge that the mandated vaccines were neither safe, nor effective by any reasonable or objective measure. In fact, AstraZeneca's records will show its vaccinated employees were contracting COVID-19 at similar or higher rates than unvaccinated religious employees, like Ms. Seher, during the relevant time frames.

35. In fact, Ms. Seher personally recalls her own team members that had already been vaccinated against COVID-19 calling out sick and advising her that they tested positive for COVID-19 during the relevant period.

---

[1] *See* Madeline Holcombe*, Fully vaccinated people who get a Covid-19 breakthrough infection can transmit the virus, CDC chief says, CNN Aug. 6, 2021,* last visited September 20, 2024, available at https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html.

36.     Ms. Seher's observation of vaccine inefficacy is consistent with research from one of the world's most prestigious medical institutions-the Cleveland Clinic, which has found that the risk of contracting COVID-19 **increases** with the number of vaccine doses received.[2]

37.     Regardless of its contemporaneous knowledge that COVID-19 vaccines were ineffective at preventing the transmission and infection of COVID-19, AstraZeneca implemented and maintained the Mandate as a condition of continued employment against employees it knew were unable to comply for religious reasons, knowing that the mandated medical procedure was at best a personal protection device, and those employees with religious objections to vaccination could have been seamlessly accommodated at little or no cost (even assuming the fiction that the mandated vaccines actually worked to prevent infection and transmission – the undergirding rationale for Mr. Seher's termination).

38.     AstraZeneca also knew or should have known that the mandated vaccines were not "safe" by any reasonable measure. It's business records will demonstrate the same.

39.     Despite actual and/or constructive knowledge of adverse events related to the COVID-19 vaccines and readily available to AstraZeneca after Ms. Seher submitted her religious exemption request, AstraZeneca required Ms. Seher to violate her religious beliefs, justifying the violation of her religious integrity on provably false justifications that the mandated vaccines were

---

[2] *See* Nabin K. Shrestha et al., MedRxiv, *Effectiveness of Coronavirus Disease (COVID-19) Bivalent Vaccine*, (Dec. 19, 2022), available at https://www.medrxiv.org/content/10.1101/2022.12.17.22283625v1 (in comprehensive study, researchers found the risk "of COVID-19 increased with time since the most recent prior COVID-19 episode **and with the number of vaccine doses previously received**") (**emphasis added**) (last visited September 20, 2024).

"safe" and "effective" and, therefore, that workplace safety demanded she discard her religious beliefs.

40.    Despite clearly stated religious reasons for declining vaccination, AstraZeneca — in reckless disregard of Ms. Seher's Title VII rights — insisted that Ms. Seher abandon her beliefs in exchange for personal protection, counterfactually insisting that accommodating Ms. Seher's beliefs would cause an undue hardship on its business.

41.    Again, the mandated vaccines do not prevent transmission or infection. At best, the mandated vaccines provided an undefined level of personal protection, a benefit Ms. Seher gladly declined to preserve her religious integrity.

***Ms. Seher's Religious Accommodation Request***

42.    As a devote Christian, Ms. Seher holds sincere beliefs that preclude her from complying with COVID-19 vaccination.

43.    On or around February 24, 2022, Ms. Seher submitted her religious exemption request.

44.    In her request, Ms. Seher explained that "as a Christian, it is [her] sincerely held belief, as based on the explicit teachings of God's Inspired Word, the Holy Bible, that taking the COVID-19 vaccine would be a sin and therefore a violation of [her] Christian faith."

45.    Ms. Seher believes that her body is a Temple of God, and therefore, she is commanded to glorify God in her body. Furthermore, Ms. Seher believes that consuming any substance that has the risk of potentially harming her spiritually or physically would be disobedient, rebellious, and otherwise irreverent to God, and therefore would be a sin, triggering eternal consequences.

9

46.     On separate and distinct grounds, also for religious reasons, Ms. Seher does not preemptively take medicine if she is not sick. She believes that God knitted her together in her mother's womb and that she is fearfully, intelligently, and wonderfully made by God. Thus, she does not preemptively tinker with the immune system that God created if no sickness exists, believing that to do so would be playing God and showing a lack of faith in His perfect design. Because of these religious beliefs, she does not consider unnatural medical interventions unless absolutely necessary (in the event of a sickness). This practice to not preemptively tinker with the immune system she believes God designed is a practice she has integrated into her life for many years.

47.     She incorporates these religious beliefs into her life, approaching health decisions with a natural and more holistic view, focusing on healthy diet, exercise, proper rest, and prayer and meditation (which she believes allows God to proactively maximize His design for her body, instead of unnatural, preemptive medical measures in cases where a disease is not present).

48.     She believed and sincerely believes that receipt of a COVID-19 vaccine would harm her spiritually, that it would defile her spiritual being.

49.     Additionally, on separate and distinct grounds, Ms. Seher fully believes that submitting to a COVID-19 vaccine mandate would be potentially damaging spiritually and physically, and therefore sinful and an affront to God. She believes that the indwelling Holy Spirit is grieved when a believer sins and acts against God-given convictions, and that such willful and deliberate sinning and grieving of the Holy Spirit can call into question the validity of one's own salvation.

10

50.     After careful thought and prayer, and after application of the foregoing religious beliefs and practices to the weighty issues posed by the vaccine Mandate, Ms. Seher came under strong spiritual conviction that she must not receive a COVID-19 vaccine. She sincerely believes that receipt of a COVID-19 vaccine would cause her to be unclean and would prevent her from worshipping and communing with God. In other words, Ms. Seher believes that receiving a COVID-19 vaccine would cut her off from God, having profound eternal consequences.

51.     In her accommodation request, Ms. Seher cited (James 4:17), which states: "For a Christian to do what he is convinced in his conscience is wrong, then it is sin."

52.     Ms. Seher is not willing to lose a successful career over medical concerns about vaccination. She was only willing to lose her career for her religious convictions in conflict with vaccination.

53.     AstraZeneca's vaccination mandate was a decision point that Ms. Seher seamlessly placed under the umbrella of her established and regular religious practices of seeking God's guidance for life decisions, large and small. If she lacks spiritual peace when confronted with a life decision, it is a violation of her religious practices to engage in that behavior. Similarly, if she has spiritual peace about a decision or route to take, she must, for religious reasons, follow that path.

54.     Once she receives instruction from God to act, or not act, she is very careful to conduct her actions in accordance with her spiritual convictions, which she believes God imparts directly to her, particularly in cases where, like here, Ms. Seher has been faithful to search out God on the issue and received firm conviction from God.

11

55. Prior to submitting a religious accommodation request to the Mandate, Ms. Seher engaged this process and came under firm religious conviction that she must not receive a COVID-19 vaccine.

56. As another example of this religious practice, Ms. Seher is an avid mountain-biker. She, typically, does not wear a full-face helmet when mountain biking on her local trails. She firmly believes that one day before a ride, God spoke to her directly and advised her to wear a full-face helmet when riding a path that she had ridden countless other times. She could not explain the conviction, but knew she must obey, so she wore a full-face helmet. On that day, Ms. Seher's front tire rammed into the boulder of an upward climb and she launched, face-first, into the rock. Her chin-guard was severely damaged, but she escaped the fall with minor scratches and injuries. If she had not had a full-face helmet on that day, it is very likely Ms. Seher would have completely broken her jaw and would have required significant medical intervention. Before and since then, she has been very careful to obey her convictions when she knows God has spoken directly to her, like with the vaccine Mandate.

57. Ms. Seher made clear to AstraZeneca her religious conflict with vaccination, including for reasons detailed above, in her religious accommodation request and answers to the company's follow-up questions to same.

58. However, AstraZeneca refused to engage in a good faith interactive process to: (1) identify what reasonable accommodations were available; and (2) to learn the details of Ms. Seher's religious conflict with receiving a COVID-19 vaccine. Had AstraZeneca operated in good faith, it would have identified a variety of low-cost and no-cost accommodation options and would have validated that Ms. Seher possesses profound religious objections to vaccination.

12

59.     Instead, AstraZeneca (through its attorneys and HR representatives) summarily concluded that it would terminate Ms. Seher, at least partially, because accommodating her would result in undue hardship to the company. This was despite the fact that Ms. Seher's role required no in person contact, and that a multitude of no-cost and low-cost accommodation options existed.

**AstraZeneca's Bad Faith Accommodations Process**

60.     AstraZeneca provided instructions on obtaining religious and medical exemptions from the Mandate.  Exemption requests had to be submitted by February 28, 2022.

61.     Religious      exemption      requests      were      to      be      sent      to USVaccineExemptions@astrazeneca.com via the Religious Reasonable Accommodation Request Form (the "**Form**"), answering the following questions:

> Please describe the nature of your objection(s) to the Company's COVID-19 vaccination requirement.
>
> How long have you held the religious belief underlying your objection? What is the name of your religion and are you a member of a place of worship (church, synagogue, mosque, etc.)?
>
> Please explain how the religious belief that prevents you from receiving the COVID-19 vaccine affects other areas of your life. For example, have you received other vaccines in the past? If so, please explain how your religious belief prevents you from getting the COVID-19 vaccine but not other vaccines.
>
> Have you ever requested a religious accommodation previously, either on your own behalf or on behalf of a family member, such as a child who was subject to a school's vaccination requirements? If yes, please describe.
>
> Please attach any supporting documentation that may be helpful in evaluating this request for accommodation, this may include a website with information on your religious beliefs or practices, or a letter from a religious leader describing your specific religious beliefs and/or the tenets of the religion that limits or restricts you

13

from being vaccinated. If submitting a letter from a pastor, please also describe how long you have known this individual.

62. AstraZeneca warned Ms. Seher in the religious accommodation form that the information in her religious exemption request must be "accurate." The company went so far as to threaten Ms. Seher that any perceived "misrepresentation" in the religious exemption request would be grounds for "disciplinary action," up to and including dismissal.

63. When Ms. Seher submitted her accommodation requested, she validated that she possesses "a sincerely held religious belief" that necessitated a reasonable accommodation from the Mandate, subjecting herself to dismissal if her verification was deemed to be a misrepresentation.

64. On March 9, 2022, Ms. Seher received a series of follow-up questions, apparently seeking to undermine the sincerity of her beliefs.

65. On belief, these questions were crafted by attorneys. But AstraZeneca did not inform Ms. Seher that attorneys were involved in the accommodation process, and did not inform her that it may be prudent for her to seek legal counsel to navigate its accommodation process that was crafted by AstraZeneca attorneys.

66. The accommodation process was constructed in bad faith, with the intention to purge the maximum number of employees with religious beliefs and practices in conflict with vaccination as possible.

67. The questions demonstrated that AstraZeneca did not individually review Ms. Seher's request, as it requested redundant information that had already been outlined by Ms. Seher

14

in her original request. Rather, the boilerplate follow-up questions were crafted to maximize the company's discriminatory goals.

68.     The supplemental questions were as follows:

"Please explain how the religious belief that prevents you from receiving the COVID-19 vaccine affects other areas of your life. For example, have you received vaccines or other medical treatment in the past? If so, please explain how your religious belief prevents you from getting the COVID-19 vaccine, but not other vaccines or medical treatment.

Your request mentions that you cannot get vaccinated because of your beliefs that your body is a temple and you are prohibited from putting harmful substances into your body. To help us understand your religious beliefs better, can you confirm whether, for the period while you have held these religious beliefs, you have smoked cigarettes, consumed alcohol, received any tattoos or used any legal recreational drugs? If yes, please describe why these activities do not violate your religious belief that your body should not be subjected to anything that may harm it.

You mention that your Christian beliefs prevent you from receiving the COVID 19 vaccine. We note that the leadership of your church has publicly said and/or issued written guidance providing that the tenets of your religion do not prohibit followers from receiving the vaccine. Please explain how your views differ from those of your church's leadership."

69.     Although Ms. Seher had clearly articulated answers to these questions in her original request, she submitted her answers to the supplemental questions, further detailing her religious conflict with vaccination, including the reasons detailed in this Complaint.

70.     On March 31, 2022, Ms. Seher received a boilerplate email that denied her religious accommodation request, noting that she "was not qualified for a reasonable accommodation." Said differently, AstraZeneca unilaterally concluded without further discussion that Ms. Seher's

sincerely held religious beliefs in conflict with receipt of a COVID-19 vaccine did not entitle her to protection under Title VII, and/or that she could not be accommodated without undue hardship.

71.     On April 18, 2022, Ms. Seher emailed AstraZeneca to voice her concerns with the wholly unreasonable and impersonal "reasonable" accommodation process.[3]

72.     She made clear that she would further detail her religious conflict if that would mean preserving her career.

73.     Ms. Seher attempted to push back on her denial and inquire on any way that she could work with AstraZeneca in order to be accommodated.

74.     Ms. Seher would have happily provided additional information to further detail her accommodation request if it was needed, including a discussion of reasonable accommodation options she would abide by, but AstraZeneca refused to engage with Ms. Seher regarding her reasonable questions.

75.     No HR representative, or any AstraZeneca employee, ever spoke to Ms. Seher about her sincere religious beliefs precluding receipt of a COVID-19 vaccine.

76.     Ms. Seher had already been providing COVID-19 test results since August of 2021, and could have continued to do so at low-cost/no cost to AstraZeneca (free testing was available through the federal government at the time, and was also available for free through private parties during the relevant timeframe, including in areas where Ms. Seher lived).

---

[3] See Exhibit 1, Email to HR.

77.   Free testing was available for Ms. Seher during the relevant period, so testing was a no-cost option that Ms. Seher would happily have abided by (even assuming the fiction that she was not already working 100% remotely).

78.   On April 19, 2022, the law firm of Siri & Glimstad LLP sent a letter to AstraZeneca outlining why AstraZeneca had violated the law regarding its vaccination mandate and accommodations policies, and requested that AstraZeneca reconsider the option of telework for all employees seeking exemptions.[4]

79.   On belief, many other attorneys contacted AstraZeneca prior to Ms. Seher's termination and highlighted that AstraZeneca's actions related to the Mandate and its' religious accommodation process were violating Title VII.

80.   Nonetheless, AstraZeneca willfully disregarded Title VII's requirements and continued to insist it would not accommodate Ms. Seher's clearly stated religious conflict with receipt of a COVID-19 vaccine.

81.   AstraZeneca terminated Ms. Seher on April 29, 2022.

***Events Following Termination***

82.   On August 18, 2022, Ms. Seher filed official charges with the Equal Employment Opportunity Commission alleging disparate treatment religious discrimination and failure to accommodate her sincerely held religious beliefs precluding receipt of a COVID-19 vaccine.[5]

---

[4] See Exhibit 2, Attorney Letter to AstraZeneca Counsel.

[5] See Exhibit 3, EEOC Charges of Discrimination.

17

83.     On August 7, 2024, the EEOC issued a Determination finding probable cause that Defendant discriminated against Ms. Seher based on her religious beliefs.[6]

84.     On September 17, 2024, the EEOC issued an official Right to Sue notice.[7]

## V.     CAUSES OF ACTION

### COUNT ONE
### TITLE VII-RELIGIOUS DISCRIMINATION
### FAILURE TO ACCOMMODATE
### 42. U.S.C. §2000(e), *et. seq.*

85.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as fully set forth herein.

86.     Title VII of the Civil Rights Act of 1964, as amended in 1972, makes it unlawful for an employer to discriminate against an employee on the basis of religion. 42 U.S.C. § 2000e-2(a)(1).

87.     The statute states that it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion[.]" *Id*. The term "religion" as used within Title VII includes "all aspects of religious observance and practice, as well as belief." *Id*.

88.     "Religion" is defined to include all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's religious observance or practice without undue hardship on the conduct of the

---

[6] See Exhibit 4, EEOC Determination.

[7] See Exhibit 5, EEOC Right to Sue

employer's business." 42 U.S.C.S. § 2000e(j). Because this definition includes a requirement that an employer "accommodate" an employee's religious expression, an employee is not limited to the disparate treatment theory to establish a discrimination claim.

89.     An employee can bring suit based on the theory that the employer discriminated against them by failing to accommodate the employee's religious beliefs in conflict with an employment policy. *See Chalmers v. Tulon Co.*, 101 F.3d 1012, 1014 (4th Cir. 1996).

90.     To establish a *prima facie* case of failure to accommodate a religious belief, a plaintiff must show that: (1) [she] holds a *bona fide* or otherwise sincere religious belief that conflicts with an employment requirement; (2) [she] has informed the employer about the conflict; and (3) [she] was discharged or disciplined for failing to comply with the conflicting employment requirement. *Id.* at 1019.

91.     Ms. Seher was baptized and raised in the Greek Orthodox Church. Her sincere and personal connection with God was more firmly established when she began to regularly study the Bible and then moved to North Carolina and began to engage on a daily basis with individuals who had close relationships with God.

92.     Ms. Seher is fully convinced of God's goodness and plan for her life, including related to the Mandate.

93.     She seeks God's guidance for small and major decisions.

94.     Ms. Seher considers receiving a COVID-19 vaccine a major life decision.

95.     After seeking God's guidance regarding whether to receive a COVID-19 vaccine, she came under strong spiritual conviction that she must not receive a vaccine. She sincerely believes that to do so would be a sin, an act that would have eternal consequences.

19

96. For the reasons detailed throughout, Ms. Seher holds sincere beliefs that preclude her from receipt of a COVID-19 vaccine and informed AstraZeneca of same.

97. On February 24, 2022, Ms. Seher submitted her religious exemption request and outlined her religious conflict with vaccination, placing AstraZeneca on notice of a duty to accommodate short of undue hardship.

98. In her request, Ms. Seher explained in-depth that although she is not against all vaccines or medical procedures, she strongly believes that Christians should object any medical product or treatment that violates their conscience or that they are told by God not to receive.

99. When God tells Ms. Seher to act, or not to act, she does not question His guidance and listens to His word. She believes that to reject a God-given conviction would be a sin.

100. Ms. Seher believes that the Holy Spirit dwells within her, and that her body is a Temple of God. After focused thought and prayer, Ms. Seher came under firm spiritual conviction that COVID-19 vaccines would be harmful to her spiritually or physically and therefore, she must honor and safeguard the Temple of God's spirit by foregoing vaccination. She also believes that to preemptively tinker with the immune system God created would violate God's plan for her life, and that it would be a sin to violate the strong convictions against vaccination imparted to her by God.

101. Although she does not know the precise details of what would occur spiritually, she is certain that receiving a COVID-19 vaccine would realistically cause spiritual harm. Otherwise, God would not have placed her under such strong conviction not to receive a COVID-19 vaccine.

102. If given the opportunity, Ms. Seher would have gladly further expounded upon her religious conflicts with receipt of a COVID-19 vaccine to HR or the AstraZeneca attorneys that

20

reviewed and advised on her accommodation request, but no HR representative or legal representative ever spoke with her individually regarding her sincerely held religious beliefs in conflict with receipt of a COVID-19 vaccine.

103.    In other words, AstraZeneca instituted a bad faith accommodation process that purposefully avoided identifying the full details of Ms. Seher's religious conflict with vaccination. Had it implemented a good faith accommodation process, it would have been unable to rid itself of the maximum number of employees who had disfavored religious beliefs in conflict with vaccination, like Ms. Seher.

104.    Ms. Seher's beliefs are indeed sincere, as evidenced by her willingness to uphold her beliefs while threatened with the loss of her livelihood and career.

105.    In addition, for the reasons detailed throughout, Ms. Seher's beliefs against receiving a COVID-19 vaccine are based on her religious convictions.

106.    The "proper analysis of what constitutes a religious belief under Title VII is the same as that applied in the selective service cases." *EEOC v. Alliant Techsystems*, 1998 WL 777015, at *18-19 (W.D. Va. 1998) *(citing Welsh v. United States*, 398 U.S. 333, 26 (1970) and *United States v. Seeger*, 380 U.S. 163, 13 (1969)).

107.    "[T]he belief must only 'stem from [the person's] moral, ethical, or religious beliefs about what is right and wrong and that these beliefs be held with the strength of traditional religious convictions.'" *Id*. citing *Welsh*, 398 U.S. at 340.

108.    "A plaintiff's religious beliefs 'need not be acceptable, logical, consistent, or comprehensible to others.'" *Id*. citing *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 714 (1981).

109.	"The Supreme Court has made it clear that as long as a party's beliefs are religiously asserted, it is not for the courts to challenge the truthfulness of such assertions simply because they developed 'from revelation, study, upbringing, gradual evolution, or some source that appears entirely incomprehensible.'" *Id*. citing *Hobbie v. Unemployment Comm'n of Fla.*, 480 U.S. 136, 144 n.9 (1987).

110.	Ms. Seher's sincerely held beliefs against vaccination are fully integrated into her comprehensive religious belief system, which guides daily decision making for matters both large and small.

111.	Ms. Seher timely submitted her religious exemption request, informing Defendant of how her sincerely held religious beliefs preclude her from receiving a COVID-19 vaccine.

112.	Defendant denied Ms. Seher's religious accommodation request. Defendant did not engage in a good faith interactive process with Ms. Seher to determine if it was possible to accommodate her articulated and sincere religious objections to receipt of a COVID-19 vaccine, and in fact, never spoke to her about her religious beliefs in conflict with receipt of a COVID-19 vaccine or asked her what accommodation options she would be willing to abide by.

113.	After following its bad faith exemption/accommodation process, Defendant denied Ms. Seher's religious exemption request on March 31, 2021.

114.	Once the plaintiff has established a *prima facie* case, the burden shifts to the defendant employer to show that it could not reasonably accommodate the employee without undue hardship. *Alliant Techsystems*, 1998 WL 777015, at *18-19.

115.     The Supreme Court's recent ruling in *Groff v. DeJoy* 600 U.S. 447, 470 (2023) makes clear that an "employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*.

116.     When evaluating whether an accommodation would constitute an undue burden, employers must take "into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'" *Id.*  Thus, "courts should resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test." *Id.*

117.     Defendant is a large and sophisticated organization with considerable resources and highly advanced knowledge of vaccines. Defendant has substantial resources and as such is able to accommodate its religious employees to a greater degree and with less burden than employers with fewer resources.

118.     Because there were multiple no-cost and low-cost accommodation options available, Defendant could have accommodated Ms. Seher short of undue hardship.

119.     The most obvious accommodation option was observing the no-cost status quo of telework.

120.     There were other low-cost and no-cost accommodation options AstraZeneca refused to consider. In the event that Ms. Seher was required to travel on-site to perform her job, she could have seamlessly performed her job through, inter alia: (1) providing proof of a negative COVID-19 test in the unshown event that Ms. Seher would have been required to travel onsite; (2) masking; (3) recognizing the scientific reality of natural immunity against COVID-19 as an

accommodation option; (4) allowing for a vaccinated colleague to travel to a worksite in the unshown event that Ms. Seher would have hypothetically been required to travel onsite (i.e., voluntary schedule swapping); (5) observing other enhanced safety protocols where necessary (e.g., social distancing, masking, quarantining when symptomatic) or (6) any combination of the above.

121.    With any of these easily identifiable and low-cost/no-cost accommodation options, Ms. Seher would have been able to continue performing the essential functions of her job with minimal or no burden to Defendant.

122.    Defendant refused to consider, much less provide, any of the above-referenced or accommodations options for Ms. Seher.

123.    Instead, Defendant terminated Ms. Seher for choosing to uphold her religious convictions.

124.    Because her sincere religious beliefs precluded Ms. Seher from receiving one of the COVID-19 vaccines, and in light of the fact Defendant knew that the required vaccines were incapable of preventing infection and transmission, but would violate Ms. Seher's sincerely held religious beliefs, Defendant's actions were in reckless disregard of Ms. Seher's rights under Title VII.

125.    Multiple attorneys also reached out to Defendant in advance of Ms. Seher's termination and detailed to Defendant that its actions related to its religious employees and the Mandate violated Title VII.  Nonetheless, Defendant forged ahead with its discrimination, recklessly and maliciously disregarding Ms. Seher's Title VII rights. In other words, Defendant knew it was violating the law, but terminated Ms. Seher anyway.

24

126.    Further, Defendant's decision to end Ms. Seher's telework career based on a workplace safety justification further demonstrates AstraZeneca's reckless disregard of Ms. Seher's Title VII rights.

127.    As a result of Defendant's unlawful actions, Ms. Seher has suffered emotional and psychological distress from the loss of her career, loss of promotional opportunities, and the months of uncertainty and repeated coercion to disregard her bona fide religious beliefs in order to preserve her livelihood and career.

128.    As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; trouble sleeping and feelings of agitation; and irritability.

129.    As a result of Defendant's unlawful actions, Ms. Seher has also suffered financial harm including loss of bonuses and company stock earned, loss and/or reduced coverage of health insurance, employee assistance program, short, and long-term disability insurance, company matched retirement, tuition reimbursement, and accidental death insurance.

130.    As a result of Defendant's actions, Ms. Seher's professional reputation has been irreparably damaged. Without lawful justification, her reputation in the industry is forever damaged because an industry leader terminated her supposedly for cause, and indicated she is not re-hirable within the company or its subsidiaries, a position that has gravely impacted Ms. Seher's standing in her industry.

131.    Defendant's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for Ms. Seher's rights under Title VII. As a direct and proximate result of

AstraZeneca's discriminatory treatment, Ms. Seher has suffered, and continues to suffer, economic, pecuniary damages for which she is entitled to judgment.

132. The foregoing conduct constitutes illegal, and intentional failure to accommodate that is prohibited under 42 USC § 2000e-2 *et seq*.

133. As a direct and proximate result of the discriminatory treatment, Ms. Seher has suffered, and continues to suffer, the damages hereinafter described. Accordingly, Ms. Seher requests relief as hereinafter described.

**COUNT TWO**
**TITLE VII - RELIGIOUS DISCRIMINATION**
**DISPARATE TREATMENT**
**42 U.S.C 2000e-2(a)(1)**

134. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as fully set forth herein.

135. Ms. Seher will also demonstrate a *prima facie* case for religious discrimination under a disparate treatment theory.

136. A *prima facie* case for disparate treatment requires the plaintiff to show: (1) she is a member of a protected class, (2) satisfactory job performance (3) she suffered an adverse employment action, and (4) by presenting a mosaic of circumstantial evidence that raises an inference of discrimination. *See EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 851 n. 2 (4th Cir. 2001).

137. As a practicing Christian who notified Defendant of her religious conflict with the Mandate, Ms. Seher is a member of a protected class.

138. As demonstrated by her strong performance record, including throughout the pandemic, Ms. Seher was qualified for her job.

26

139. Ms. Seher suffered adverse employment action when she requested religious accommodation to the Mandate and was denied. She suffered additional adverse action when she was terminated for non-compliance with the Mandate due to her religious conflict.

140. The circumstances surrounding Ms. Seher's termination generate strong inferences of discrimination.

141. Defendant treated secular employees, with medical conflicts with the Mandate, more favorably than similarly situated employees, religious employees with a religious conflict with the Mandate.

142. AstraZeneca knew or should have known during the relevant time frames that the mandated vaccines were incapable of preventing infection of COVID-19. Yet, the company terminated Ms. Seher on provably false rationales, asserting that Ms. Seher must violate her religious beliefs because workplace safety could only be achieved through vaccination. AstraZeneca also knew that many low-cost and no-cost accommodations were readily available, yet counterfactually claimed the opposite. AstraZeneca also knew its vaccinated employees were contracting COVID-19 at similar or higher rates than unvaccinated religious employees, like Ms. Seher. Nonetheless, the company counterfactually maintained that Ms. Seher posed an unacceptable safety risk relative to its secular vaccinated employees, and that her career must, therefore, be ended. In these circumstances, an inference of discrimination is more than plausible.

143. On belief, AstraZeneca replaced Ms. Seher with an employee outside the relevant protected class, a vaccinated employee who did not possess religious beliefs in conflict with vaccination, giving rise to further inferences of discrimination.

27

144. On belief, AstraZeneca also accommodated unvaccinated employees similarly situated to Ms. Seher who had significantly more in-person contact than Ms. Seher, provided those employees sought accommodation for secular medical reasons. This gives rise to additional inferences of unlawful discrimination. *See EEOC v. Abercrombie & Fitch Stores, Inc*., 575 U.S. 768, 774 (2015) (holding that Title VII's "disparate-treatment provision prohibits actions taken with the *motive* of avoiding the need for accommodating" religious beliefs) (emphasis in original)).

145. Refusing to accommodate religious beliefs because of their religious nature, but accommodating medical needs, is precisely the type of behavior the Supreme Court recently stated would violate Title VII. The Supreme Court ruled "a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered "undue." ' *Groff*, 600 U.S. at 472.

146. On belief, AstraZeneca did in fact provide religious accommodations at higher rates to employees belonging to religious belief systems that differed from Ms. Seher's disfavored religious beliefs in conflict with vaccination (e.g., employees from faith systems other than Christianity – such as Taoism, Buddhism, or Islam – with religious beliefs in conflict with vaccination more favorably than religious beliefs in conflict with vaccination based on Judeo-Christian based beliefs (like Ms. Seher's accommodation request)).

147. On belief, Defendant permitted secular employees with medical accommodations and with no religious objections to vaccination to continue teleworking after it terminated Ms. Seher.

148. Defendant also knew that requiring Ms. Seher to comply with the Mandate would force her to violate her religious beliefs.

28

149.    Ms. Seher gladly declined any hypothetical personal protection the COVID-19 vaccines may have provided in order to preserve her religious convictions.

150.    For the reasons detailed throughout, any reasons Defendant attempts to justify Ms. Seher's termination are pretext. Most glaringly, Ms. Seher was working remotely and was performing her essential job functions at a high level when AstraZeneca terminated her, yet AstraZeneca inauthentically claimed that accommodating her would constitute an undue hardship.

151.    Furthermore, the publicly available data that the vaccines were incapable of preventing infection or transmission, or at least providing some defined level of protection, further demonstrates Defendant's disingenuous justification for terminating religious employees, like Ms. Seher. If workplace safety was truly its intention, Defendant would have accepted natural immunity as satisfying the Mandate's requirements (which it did not), would have informed its employees of the significant safety risks associated with the COVID-19 vaccines, and would have required its vaccinated employees, who were contracting COVID-19 at similar or higher rates than unvaccinated religious employees like Ms. Seher during the relevant timeframes, to adhere to enhanced safety protocols to ensure vaccinated employees did not spread the virus to vulnerable co-workers and to members of the public at large.

152.    In short, considering the foregoing, Ms. Seher was terminated "because of" her religious beliefs.

153.    AstraZeneca possessed unlawful motivations to purge the maximum number of employees who possessed religious objections to vaccination as possible, including Ms. Seher.

154.    The aforementioned conduct is prohibited under Title VII and constitutes a violation of the same.

29

155. For the reasons detailed throughout, Defendant recklessly and maliciously disregarded Ms. Seher's Title VII rights, meriting punitive damages.

156. In addition to financial loss, Ms. Seher suffered emotional and psychological harm from the months of uncertainty and repeated coercion to disregard her bona fide religious beliefs in order to preserve her livelihood and career. As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; trouble sleeping; and feelings of agitation, and irritability.

157. Ms. Seher seeks back pay, interest on back pay, the value of back benefits, and front pay all through the date of trial, attorney fees, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses and punitive damages.

158. All of the aforementioned damages were actually and proximately caused by Defendant's violation of Title VII.

159. As a direct and proximate result of the discriminatory treatment, Plaintiff has suffered, and continues to suffer, the damages hereinafter described.

160. Accordingly, Ms. Seher requests relief as hereinafter described.

**COUNT THREE**
**WRONGFUL DISCHARGE**
**NORTH CAROLINA EQUAL EMPLOYMENT PRACTICES ACT**
**(N.C. Gen. Stat. Ann. § 143-422.2)**

161. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as fully set forth herein.

30

162.     As a general matter, North Carolina is an at-will employment state. This means that employers and employees may terminate their employment relationship at any time. *See Still v. Lance*, 279 N.C. 254, 182 S.E.2d 403 (1971).

163.     A narrow public policy exception to this employment-at-will doctrine exists in the tort of wrongful discharge in violation of public policy. There can be no right to terminate such a contract for an unlawful reason or purpose that contravenes public policy. *See McKinney v. N. Telecom*, CIVIL NO. 1:91CV00426, 1992 U.S. Dist. LEXIS 21948, at *1 (M.D.N.C. Sep. 24, 1992).

164.     There is no outlined private right of action under the North Carolina Equal Employment Practices Act ("**NCEEPA**"), however, plaintiffs can properly allege a wrongful discharge in violation of a public policy that is anti-discriminatory under the Act. *See Jackson v. Blue Dolphin Communs. of N.C., L.L.C.*, 226 F. Supp. 2d 785, 2002 U.S. Dist. LEXIS 19337 (W.D.N.C. 2002).

165.     "It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees" *Id*.

166.     Defendant is a sophisticated corporation employing well over 15 employees and is therefore subject to the public policy set forth under the NCEEPA.

167.     Defendant is subject to penalties for wrongful discharge under the NCEEPA for violations of North Carolina's anti-discriminatory public policy.

31

168.     As detailed above and throughout this Complaint, Defendant violated Title VII by engaging in religious discrimination and failing to accommodate Ms. Seher's religious beliefs.

169.     The aforementioned conduct is prohibited under Title VII and constitutes a violation of same, and therefore, violates the NCEEPA.

170.     In addition to financial loss, Ms. Seher suffered emotional and psychological harm from the months of uncertainty and repeated coercion to disregard her bona fide religious beliefs in order to preserve her livelihood and career.  As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; trouble sleeping; and feelings of agitation, and irritability.

171.     Ms. Seher seeks back pay, interest on back pay, the value of back benefits, and front pay all through the date of trial, attorney fees, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses and punitive damages.

172.     All of the aforementioned damages were actually and proximately caused by Defendant's violation of Title VII and the NCEEPA.

173.     As a direct and proximate result of the discriminatory treatment, Plaintiff has suffered, and continues to suffer, the damages hereinafter described. Accordingly, Ms. Seher requests relief as hereinafter described.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant, awarding relief as follows:

32

i.      Declare that Defendant discriminated against Ms. Seher in violation of Title VII for its failure to provide a reasonable accommodation to her sincere religious beliefs when numerous no-cost or low-cost options were available;

ii.     Declare that Defendant violated Title VII by refusing to recognize Ms. Seher's sincere religious beliefs in conflict with the Mandate;

iii.    Declare that Defendant violated Title VII by treating religious employees like Ms. Seher less favorably than similarly situated employees outside the relevant protected class;

iv.     Declare that Defendant recklessly disregarded Ms. Seher's Title VII rights;

v.      Declare that Defendant violated the NCEEPA by wrongfully discharging her employment in violation of Title VII;

vi.     Require Defendant's supervisors and upper management to undergo training for Title VII regarding their duties to avoid discrimination on the basis of religion, consistent with Title VII's requirements;

vii.    Issue a permanent injunction requiring Defendant to expunge Ms. Seher's personnel files of any derogatory, false, or misleading information relating to this matter;

viii.   Award Ms. Seher damages, which exceed $100,000.00, including back pay, front pay, pre-judgment and post-judgment interest, punitive damages, compensatory damages, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

ix.     Award Ms. Seher damages necessary to make her whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including but not limited to, emotional pain, suffering, inconvenience,

33

loss of enjoyment of life, humiliation, and loss of civil rights, in an amount to be determined at

trial;

        x.     Award Ms. Seher damages for severe emotional distress that resulted from

Defendant's unlawful actions;

        xi.    Award Ms. Seher reasonable attorneys' fees and costs; and

Grant any other relief that the Court deems just and proper.

## VII.   <u>DEMAND FOR JURY TRIAL</u>

        Plaintiff hereby demands trial by jury on all counts so triable.

Dated:  November 27, 2024         Respectfully submitted,

                                    **SIRI | GLIMSTAD LLP**

                                    <u>*/s/ Dana Smith*</u>
                                    Dana Smith, Attorney
                                    SIRI | GLIMSTAD LLP
                                    NC BAR:#51015
                                    525 North Tryon Street
                                    Suite 1600, #7433
                                    Charlotte, North Carolina 28202
                                    Phone: (980) 448-1299
                                    Facsimile: 646-417-5967
                                    dsmith@sirillp.com

                                    Walker Moller*
                                    SIRI | GLIMSTAD LLP
                                    1005 Congress Avenue
                                    Suite 925-C36
                                    Austin, Texas 78701
                                    Main: 512-265-5622
                                    Facsimile: 646-417-5967
                                    wmoller@sirillp.com

Jack R. Spitz*
Siri | Glimstad llp
8 Campus Drive, Suite 105 PMB#161
Parsippany, New Jersey 07054
Main: 212-532-1091
Facsimile: 646-417-5967
jspitz@sirillp.com

*Counsel for Plaintiff*

*\*Motion to be admitted Pro Hac Vice to be submitted*

35